**ATLAS | SOLOMON LLP**
NATALIE L. WINSLOW
Nevada Bar No. 12125
ATLAS | SOLOMON LLP
7674 W. Lake Mead Blvd., Suite 220
Las Vegas, Nevada 89128
Telephone No.: (725) 315-9572
Email: nwinslow@atlas-solomon.com
*Attorneys for Change Lending, LLC dba Change Home Mortgage*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| CHANGE LENDING, LLC DBA CHANGE HOME MORTGAGE,<br><br>Plaintiff,<br><br>-vs-<br><br>VILLAGE CAPITAL & INVESTMENT LLC; DOE INDIVIDUALS I-X, inclusive; and ROE CORPORATIONS I-X, inclusive,<br><br>Defendant(s). | CASE NO.: 2:25-cv-01600<br><br>**COMPLAINT** |

Plaintiff Change Lending, LLC dba Change Home Mortgage, by and through its undersigned counsel, sues defendant Village Capital & Investment LLC and alleges as follows:

**NATURE OF THE ACTION**

1. Change Lending services thousands of mortgage loans across the nation on behalf of many investors, including the Government National Mortgage Association (**Ginnie Mae**).

2. Village Capital also services mortgage loans on behalf of Ginnie Mae.

3. This dispute involves a contract between Change Lending and Village Capital for the sale of servicing rights related to a pool of mortgage loans owned by Ginnie Mae. The parties' written agreement for the sale of these servicing rights is contained within the Mortgage Servicing Rights Purchase and Sale Agreement (Government

1

Mortgage Loans) (**PSA**), whereby Change Lending agreed to sell to Village Capital its servicing rights (**Purchased Servicing Rights**) in respect of a pool of mortgage loans specified in the PSA (**Mortgage Pool**).

4. Village Capital did not comply with the terms of the PSA. As a result of Village Capital's actions, Change Lending is damaged and seeks redress from this Court.

## THE PARTIES, JURISDICTION, VENUE, AND CHOICE OF LAW

5. Change Lending is a limited liability company organized and existing under the laws of California. Change Lending's members are citizens of California, New Jersey, and Texas. For jurisdictional purposes, Change Lending is a citizen of California, New Jersey, and Texas.

6. Village Capital is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Nevada. Village Capital has represented in court filings in other jurisdictions that its members are all Nevada citizens. *See, e.g.*, *Nelson v. Village Capital & Investment, LLC et al.*, No. 4:22-cv-03130 (S.D. Tex. 2022). Nevada's secretary of state records show that Village Capital has one member with a Nevada address. Upon information and belief, all of Village Capital's members are Nevada citizens. Village Capital is a citizen of Nevada for jurisdictional purposes.

7. Doe Individuals I through X, inclusive (the **Doe Defendants**), are individuals who may be liable for damages with the named defendants on the allegations set forth in this complaint. Change Lending may seek leave to amend this complaint to reflect the true names and identities of the Doe Defendants when known.

8. Roe Corporations I through X, inclusive (the **Roe Defendants**), are corporate entities that may be liable for damages with the named defendants on the allegations set forth in this complaint. Change Lending may seek leave to amend this complaint to reflect the true names and identities of the Roe Defendants when known.

9. Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 exclusive of interest, costs, and attorneys' fees, and the controversy is between citizens of different states.

2

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Village Capital's principal place of business is within this district.

11. The PSA, dated June 29, 2023, between Change Lending and Village Capital is the subject of this dispute. A copy of the PSA is attached to this complaint as **Exhibit 1**. The parties agreed in the PSA that any claim arising under or related to the PSA or the transactions contemplated by the PSA would be commenced, heard, and determined exclusively in any State or Federal court located in Clark County in the State of Nevada. The parties further submitted to the personal jurisdiction of such courts for purposes of a covered action under the PSA. Ex. 1 at § 11.07.

12. New York law controls this dispute. The PSA that is the subject of this dispute provides that "all Claims arising hereunder or relating to the transactions contemplated hereby, shall be governed by the Laws of the State of New York." *Id*. at § 12.07.

## GENERAL ALLEGATIONS

**A. The Parties' Relationship with Ginnie Mae**

13. Ginnie Mae, through its mortgage-backed securities (**MBS**) programs, guarantees securities that are backed by pools of mortgages. This guaranty ensures the security holder receives the timely payment of scheduled monthly principal and any unscheduled recoveries of principal on the underlying mortgages, plus interest at the rate provided for in the securities. The Mortgage Pool was included in mortgage-backed securities guaranteed by Ginnie May under one of its MBS programs.

14. Ginnie Mae's MBS programs are governed by, and subject to, terms and requirements set forth in a guide published by Ginnie Mae (**Guide**). The Guide serves as a central document governing the contractual relationship between Ginnie Mae and its servicers nationwide, including Change Lending and Village Capital. A copy of the Guide is publicly available at:

 http://www.ginniemae.gov/issuers/program_guidelines/Pages/mbs_guide.aspx (last accessed Aug. 27, 2025). The Purchased Servicing Rights are subject to the terms and requirements of the Guide.

15. Pursuant to the Guide, the servicer is obligated to pay to the security holders funds sufficient to allow them to withdraw timely monthly payments of principal and interest on the securities. If the full amount due to the holders of the securities has not been received from mortgage borrowers, then the servicer must advance the difference to the holders of the securities and recoup the advance from payments subsequently received from mortgage borrowers. *See generally* Guide at Ch. 15.

16. To facilitate the monthly payments required by the Guide, the servicer must deposit the funds into a central principal and interest custodial account on the 19th calendar day of each month by 7:00 AM eastern time. *Id*. at Ch. 15, Part 3.

17. If a servicer fails to comply with the terms of the Guide, Ginnie Mae may declare the servicer in default of its responsibilities under the Ginnie Mae MBS program and is entitled to avail itself of various remedies under the Guide, including termination of the servicing rights in respect of the relevant pool and revocation of the servicer's status as an approved servicer of loans generally. *Id*. at Ch. 23.

**B. The Mortgage Servicing Rights Purchase and Sale Agreement**

18. Pursuant to the Guide, a servicer may transfer Ginnie Mae-related accounts to another approved Ginnie Mae servicer, with Ginnie Mae approval. *Id*. at Ch. 21, Part 2.

19. On June 29, 2023, Change Lending and Village Capital entered into the PSA, whereby Village Capital agreed to purchase certain servicing assets from Change Lending. Village Capital drafted the PSA. The PSA provided, in part, that "THIS AGREEMENT IS SUBJECT AND SUBORDINATE IN ALL RESPECTS TO THE RIGHTS OF GINNIE MAE UNDER THE GNMA MBS GUIDE." Ex. 1 at § 2.01 (emphasis in original).

20. The PSA contemplated an interim servicing period beginning on June 29, 2023 (the "Settlement Date") and ending on August 2, 2023 (the "Transfer Date"). *Id*. at § 7.09; *see also id*. at § 1.01 (defining Settlement Date and Transfer Date). During this interim servicing period, Change Lending continued its servicing responsibilities and requirements under the Guide, on behalf of and for the benefit of Village Capital and Ginnie Mae. This

included making all principal and interest and other servicing advances required under the Guide.

### C. Village Capital Failed to Pay Amounts Advanced to Ginnie Mae

21. Ginnie Mae did not recognize the servicing transfer from Change Lending to Village Capital until September 1, 2023. As a result, Ginnie Mae notified Change Lending, rather than Village Capital, of the obligation to remit the required August 21, 2023 principal and interest advance of $2,606,093.86, pursuant to the terms of the Guide.

22. Change Lending notified Village Capital of the outstanding balance due, and timely asked Village Capital to remit payment of $2,606,983.86 to Ginnie Mae to satisfy Ginnie Mae requirements under the Guide.

23. Village Capital recognized its obligation to remit payment, but without justification, withheld $659,464.25.

24. On August 21, 2023, Change Lending was forced to fund the $659,464.25 payment to comply with the parties' obligations under the Guide. Change Lending made this payment outside of the interim servicing period, which ended on the Transfer Date of August 2, 2023.

25. On August 23 and 24, 2023, Change Lending attempted to resolve the outstanding payment owed to Change Lending through normal business channels. Change Lending and Village Capital specifically discussed the issue on August 24, 2023, whereby Change Lending explained why Village Capital was responsible for paying the funds and requested that Village Capital reimburse Change Lending as a result.

26. On September 21, 2023, Change Lending made a written demand to Village Capital for the $659,464.25 discrepancy.

27. On October 4, 2023, Village Capital sent written correspondence to Change Lending claiming that it was not required to tender payment of the $659,464.25 in principal and interest advances. According to Village Capital, Change Lending was required to pay these amounts because the PSA contains a provision that Change Lending will pay these amounts during the interim servicing period.

28. Change Lending paid the at-issue amounts outside of the interim servicing period, after the responsibility to make these payments had shifted to Village Capital.

29. As explained above, Ginnie Mae's guidelines require its servicer to timely remit monthly principal and interest payments, and failure to do so would have entitled Ginnie Mae to terminate the Purchased Servicing Rights. *See generally* Guide at Ch. 15.

30. The PSA contains the following indemnification provision: "The Purchaser [Village Capital] shall indemnify and hold harmless the Seller [Change Lending] against all Losses (including attorneys' fees attributable to the enforcement of the Purchaser's indemnification and other obligations hereunder) that a court of competent jurisdiction determines, in a final non-appealable order, were incurred or sustained by the Seller (collectively, "Indemnified Seller Losses") directly and solely as a result of, in connection with, or relating to any failure by the Purchaser to perform the Servicing of any Mortgage Loan in accordance with Applicable Law or applicable Agency Requirements. . . ." Ex. 1 at § 11.03(b).

31. Since servicing had passed to Village Capital, Village Capital was required to pay the principal and interest advance directly or, failing that, reimburse Change Lending for the amounts advanced by Change Lending on Village Capital's behalf, pursuant to the requirements set forth in the PSA and the Guide.

32. Upon information and belief, Village Capital refuses to pay the amounts owed to Change Lending because a "Reimbursable Seller Advance" under the terms of the PSA is a "Seller Advance" that excludes principal and interest advances. Ex. 1 at p. 13.

33. Village Capital cannot rely on this interpretation of the PSA because a "Seller Advance" includes only those payments made before the Transfer Date of August 2, 2023. *See id*. The at-issue advance occurred on August 21, 2023.

34. Through its wrongful actions and tortured interpretation of the PSA, Village Capital obtained a windfall at Change Lending's expense. Upon information and belief, Village Capital received receipts from mortgage borrowers following Change Lending's payment to Ginnie Mae that "reimbursed" the advances made to Ginnie Mae. Village

Capital did not make the payment to Ginnie Mae, yet kept the reimbursements received from mortgage borrowers.

### D. Village Capital Failed to Pay Amounts Due for its Purchase of Servicing Assets

35. As consideration for Change Lending's sale of the Purchased Servicing Rights, the PSA required that Village Capital tender 90% of the estimated purchase price for the Purchased Servicing Rights, less any third-party fees and adjustments, to Change Lending no later than June 30, 2023. *Id*. at § 3.01(a).

36. The PSA required that Village Capital tender 5% of the aggregate purchase price for the Purchased Servicing Rights to Change Lending no later than August 9, 2023 (the **Transfer Payment**). *Id*. at § 3.01(c).

37. The remaining 5% of the aggregate purchase price for the Purchased Servicing Rights were classified as "Holdback Funds," securing Change Lending's obligation to cure any document exceptions for loans in the Mortgage Pool. Village was required to disburse the Holdback Funds within 30 days after October 31, 2023, and on a monthly basis thereafter until June 29, 2024, on a loan-level, pro rata basis for all loans where no document exceptions existed. Village Capital was required to issue the final document exception report to Change Lending by August 28, 2024, and if the report identified no document exceptions with respect to all mortgage loans, Village Capital was required to release the remaining Holdback Funds to Change Lending within 10 business days. *Id*. at § 3.01(d).

38. As noted above, pursuant to the PSA, Village Capital was required to pay 90% of the estimated purchase price for the servicing assets, less any third-party fees and adjustments, to Change Lending no later than June 30, 2023. Ex. 1 at § 3.01(a).

39. Village Capital paid these amounts to Change Lending.

40. Village Capital did not tender the 5% of the aggregate purchase price for the servicing assets, in the amount of $321,352.42, by August 9, 2023. *See id*. at § 3.01(c). To date, Village Capital has not paid any of these funds to Change Lending.

41. Village Capital also did not tender any Holdback Funds, in the total amount of $321,352.42, by the deadlines set forth in the PSA. *See id*. at § 3.01(c). Change Lending satisfied all conditions precedent for receiving the funds.

42. The PSA states: "Not later than thirty (30) days after the Transfer Date, and on a monthly basis thereafter until the one (1) year anniversary of the Settlement Date (the "Holdback Surrender Date"), the Purchaser [Village Capital] shall issue to the Seller [Change Lending] one or more written reports that, collectively, identify all outstanding Document Exceptions associated with each Mortgage Loan (each, a "Document Exception Report"). Upon the Seller's receipt of each Document Exception Report, and at the Seller's sole cost and expense, the Seller shall use best efforts to promptly and fully cure all outstanding Document Exceptions identified in such Document Exception Report." Ex. 1 at § 3.01(d)(i). The PSA required that Village Capital release the Holdback Funds upon Change Lending's cure of the document exceptions. *Id*. at § 3.01(d)(ii).

43. Change Lending has never received any document exception report from Village Capital.

44. Change Lending sent a written request to Village Capital on September 21, 2023, demanding these funds and reminding Village Capital that Change Lending had satisfied all conditions precedent for receiving the funds.

45. Village Capital sent a written response to Change Lending dated October 4, 2023, refusing to tender the funds owed to Change Lending. For the first time, Village Capital claimed that Change Lending had not satisfied eight specific transfer-related obligations.

46. Village Capital's claim in its October 4, 2023 letter that Change Lending had not satisfied eight specific transfer-related obligations is contradicted by the fact that Change Lending never received any document exception report. Village Capital's alleged issue with any transfer-related obligation should have been included within a document exception report, timely submitted to Change Lending, pursuant to the requirements of the PSA.

47. Village Capital's October 4, 2023 letter to Change Lending does not qualify as a document exception report because it was delivered well after the deadline for providing any such report to Change Lending.

48. To date, Village Capital has not paid any of these funds owed to Change Lending.

49. Village Capital owes the total of $642,704.83 for its purchase of the servicing assets, comprised of the remaining purchase price of $321,352.42 and Holdback Funds of $321,352.42, to Change Lending.

**E. Village Capital Failed to Reimburse Additional Advances to the FHA**

50. During the interim servicing period, Change Lending advanced $18,170.61 to the Federal Housing Administration, as required by the PSA. Ex. 1 at § 7.09.

51. This advance was made for the benefit of Village Capital.

52. FHA reimbursed these funds via wire to Village Capital, which Village Capital received on November 8, 2023.

53. On November 30, 2023, Village Capital acknowledged receipt of the funds, and that the funds were due back to Change Lending.

54. On December 4, 2023, Change Lending provided Village Capital with wire instructions to facilitate the reimbursement.

55. To date, Village Capital has not paid the $18,170.61 owed to Change Lending.

**FIRST CLAIM FOR RELIEF**

**BREACH OF CONTRACT**

56. Change Lending repeats and realleges the allegations contained within paragraphs 1 through 55 as though fully set forth herein.

57. On or about June 29, 2023, Change Lending and Village Capital entered into the written PSA.

58. Change Lending performed all of its obligations under the PSA.

59. The PSA required that Village Capital: (i) reimburse Change Lending for the amounts Change Lending advanced to Ginnie Mae on Village Capital's behalf; (ii) pay all

9

amounts due and owing for Village Capital's purchase of the servicing assets from Change Lending, including the Transfer Payment and all Holdback Funds; and (iii) reimburse Change Lending for the amounts Change Lending advanced to the FHA on Village Capital's behalf.

60. Village Capital breached the terms of the PSA when it failed to: (i) reimburse Change Lending for the amounts Change Lending advanced to Ginnie Mae on Village Capital's behalf; (ii) pay all amounts due and owing for Village Capital's purchase of the servicing assets from Change Lending, including the Transfer Payment and all Holdback Funds; and (iii) reimburse Change Lending for the amounts Change Lending advanced to the FHA on Village Capital's behalf.

61. Change Lending is damaged as a result of Village Capital's breach. It has suffered money damages for amounts owed to it in the amount of $1,320,339.69.

62. Change Lending was required to hire an attorney to prosecute this action. Change Lending is entitled to its attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**(Pled in the Alternative)**

63. Change Lending repeats and realleges the allegations contained within paragraphs 1 through 62 as though fully set forth herein.

64. Implicit in every contract is a covenant of good faith and fair dealing which encompasses any promises that a reasonable promisee would understand to be included.

65. The implied covenant of good faith and fair dealing includes a promise that "neither party to a contract shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract, or to violate the party's presumed intentions or reasonable expectations." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) (internal quotations omitted).

66. To the extent Village Capital's actions were not express breaches of the PSA, Change Lending acted in good faith and Village Capital is in breach of the implied covenant of good faith and fair dealing implied into the PSA.

67. Upon information and belief, Village Capital maintains that the language contained in the PSA does not require Village Capital to pay any amounts to Change Lending. "[W]here . . . there is a dispute over the meaning of the contract's express terms, there is no reason to bar a plaintiff from pursuing both types of claims [a breach of contract claim and a breach of the implied covenant of good faith and fair dealing claim] in the alternative." *Id*. at 206.

68. Change Lending and Village Capital entered into the PSA, with the expectation of both parties that Village Capital would pay the purchase price, including the Transfer Payment and all Holdback Funds. Village Capital has claimed pre-litigation that Change Lending did not resolve all exceptions required under the PSA, but this position is arbitrary and irrational and taken only out of Village Capital's self-interest—in bad faith and without regard to the expectation and understanding of the parties when entering into the PSA. "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (internal quotations omitted).

69. Change Lending and Village Capital entered into the PSA, with the expectation of both parties that Village Capital would be ultimately responsible for advances, fees, and other amounts that came due following the contractual date of June 29, 2023.

70. To the extent any amounts were paid by Change Lending on Village Capital's behalf, including payments to Ginnie Mae and FHA, the parties anticipated that Village Capital would reimburse these amounts to Change Lending.

71. Change Lending anticipates that Village Capital will claim that the PSA is silent as to whether Change Lending should have paid advances to Ginnie Mae outside of the interim period, and/or whether these advances are reimbursable. Change Lending paid these advances because the Guide requires that these amounts be paid by the servicer, and

Change Lending did not want to run afoul of the requirements contained within the Guide. The Guide provides for strict sanctions and penalties for a servicer's failure to comply with the Guide, including expulsion from servicing any loans on behalf of Ginnie Mae. The PSA expressly provides that it is "subject and subordinate in all respects to the rights of Ginnie Mae under the GNMA MBS Guide." Ex. 1 at § 2.01.

72. Village Capital's pre-litigation position that it will not reimburse Change Lending for this payment because the contract between the parties does not require it is arbitrary and irrational and taken only out of Village Capital's self-interest, in bad faith and without regard to the expectation and understanding of the parties when entering into the PSA.

73. Village Capital's pre-litigation position that it will not reimburse Change Lending for this payment because it does not qualify as a "Reimbursable Seller Advance" under the terms of the PSA is arbitrary and irrational and taken only out of Village Capital's self-interest, in bad faith and without regard to the expectation and understanding of the parties when entering into the PSA.

74. Village Capital's pre-litigation conduct as it relates to reimbursement for funds advanced by Change Lending to FHA—whereby Village Capital acknowledged that Change Lending was entitled to the reimbursement and then refused to actually reimburse Change Lending—is further incidence of Village Capital's arbitrary and irrational positions taken with respect to this matter, taken only out of Village Capital's self-interest and in bad faith and without regard to the expectation and understanding of the parties when entering into the PSA.

75. Change Lending is damaged as a result of Village Capital's actions. It has suffered money damages for amounts owed to it in the amount of $1,320,339.69.

76. Change Lending was required to hire an attorney to prosecute this action. Change Lending is entitled to its attorneys' fees and costs.

/ / /

/ / /

**THIRD CLAIM FOR RELIEF**

**UNJUST ENRICHMENT**

**(Pled in the Alternative)**

77. Change Lending repeats and realleges the allegations contained within paragraphs 1 through 76 as though fully set forth herein.

78. As detailed above, Village Capital was unjustly enriched when it refused to: (i) reimburse Change Lending for the amounts Change Lending advanced to Ginnie Mae on Village Capital's behalf; (ii) pay all amounts due and owing for Village Capital's purchase of the servicing assets from Change Lending, including the Transfer Payment and Holdback Funds; and (iii) reimburse Change Lending for the amounts Change Lending advanced to the FHA on Village Capital's behalf.

79. Village Capital's unjust enrichment was at Change Lending's expense. Change Lending paid amounts on Village Capital's behalf, and Village Capital refused to reimburse Change Lending. Change Lending further did not receive the entire purchase price for the sale of the servicing rights of the loans subject to the PSA.

80. It is against equity and good conscience to permit Village Capital to retain these amounts, in the total sum of $1,320,339.69. It is against equity and good conscience because Village Capital has obtained a windfall of these amounts, which was neither contemplated nor intended by the parties when they entered into the PSA. Village Capital now seeks to capitalize on this unintended windfall, at Change Lending's expense.

81. Change Lending was required to hire an attorney to prosecute this action. Change Lending is entitled to its attorneys' fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Change Lending prays as follows:

1. Judgment against Village Capital for its breach of contract in an amount of $1,320,339.69;

2. Alternatively, judgment against Village Capital for its breach of the implied covenant of good faith and fair dealing in an amount of $1,320,339.69;

3. Alternatively, judgment against Village Capital for its unjust enrichment in an amount of $1,320,339.69;

4. Pre-judgment interest;

5. For costs of suit incurred herein;

6. For reasonable attorneys' fees; and

7. For such other and further relief as the Court may deem just and proper.

DATED this 27th day of August, 2025.

ATLAS | SOLOMON LLP

/s/ *Natalie L. Winslow*
NATALIE L. WINSLOW
Nevada Bar No. 12125
7674 W. Lake Mead Blvd., Suite 220
Las Vegas, Nevada 89128
nwinslow@atlas-solomon.com